James P. Roberts, #19180
PALMER PERLSTEIN
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
(214) 987-4100
james@palmerperlstein.com

**COUNSEL FOR PLAINTIFF**

---

THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

---

| | |
|---|---|
| VIRGINIA JUNE, as Special Representative of the Estate and Heirs of NYKON BRANDON,<br><br>        Plaintiff,<br>v.<br>DALTON BEEBE, RAKHIM REDMON, OFFICER "U82", MARIKA ASCARTE, and SALT LAKE CITY CORPORATION,<br>        Defendants. | **COMPLAINT AND JURY DEMAND**<br><br><br>        Case No. 2:24-cv-581<br>        Judge |

---

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW, Plaintiff VIRGINIA JUNE, as Special Representative of the Estate and

Heirs of NYKON BRANDON, by and through counsel, hereby respectively states the following:

> "it is 'clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force.'"

*Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008).

## SUMMARY

On August 14, 2022, Salt Lake Police Officers Dalton Beebe, Rakim Redmon, Officer "U82", and Marika Ascarte restrained Nykon Brandon by using each of their body weight to apply force to his back, neck, head, and legs as he laid face down on hot gravel with his hands handcuffed behind his back. Defendants Beebe, Redmon, Officer "U82", and Ascarte restrained Nykon in this manner for a total of five minutes and one second (5:01), until Beebe asked, "Is he alive?" It was unnecessary to continue applying pressure on top of Nykon AFTER he had his hands restrained behind his back in handcuffs, as he was subdued and did not present a threat to anyone. However, shockingly, Defendants Ascarte, Officer "U82", Beebe, and Redmon continued to use their body weight to apply pressure on top of Nykon's back, neck, head, and legs as he laid face down in the prone position for a total of two minutes and thirty-four seconds (2:34) **AFTER** Nykon's hands were restrained in handcuffs behind his back. Unsurprisingly, as a result, Nykon died. The medical examiner determined that Nykon died from sudden cardiopulmonary arrest during a physical struggle with prone restraint. The doctor who performed his autopsy found that the struggle and restraint by other individuals contributed to his death.

Nykon was the second person Salt Lake City Police Officers held down in this manner and killed in a matter of months. On January 30, 2022 – less than eight months prior – Salt Lake City Police Officers held down Megan Mohn in a prone position after handcuffing her, resulting in her death. It is clear that officers from the Salt Lake City Police Department are not being trained on the dangers associated with prone restraints, which can lead to positional asphyxia and death.

In this case, Salt Lake City Police Officers were placed on notice that mental health issues were involved when a 911 call was made relaying that "a guy just tried to run in and steal beer" and that he was "definitely a danger to himself and maybe to traffic around here." The 911 caller

stated, "definitely mental health issues going on, so if you've got mental health resources, send them out." It is readily apparent that the Salt Lake City Police Department is not being trained on the appropriate way to interact with someone experiencing a mental health crisis – as the 911 caller in this case requested mental health resources be sent but the first thing officers did in this case was use force. Further, in the killing of Megan Mohn months before Nykon was killed, Ms. Mohn was experiencing a mental health crisis and the Salt Lake City Police Officers clearly had not been trained on how to manage the situation. Instead, they held her down in the prone position causing her death, just as Defendants Ascarte, Officer "U82", Beebe, and Redmon did in this case with Nykon.

Plaintiff, as Special Administrator for Nykon's estate and heirs, now files this lawsuit against Defendants Beebe, Redmon, Officer "U82", and Ascarte, and the Salt Lake City Corporation, for violating Nykon's constitutional rights under the Fourth Amendment to the United States Constitution to be free from excessive deadly force.

## I.
## PARTIES

1.    Plaintiff Virginia June is an individual residing in Larimer County, Colorado. She was appointed Special Representative of the Estate of Nykon Brandon by court Order entered in Probate Case No. 243901827 in Utah's Third District Court, in and for Salt Lake County.

2.    Defendant Dalton Beebe is an individual residing in Salt Lake County and at all times relevant to this lawsuit was a police officer with the Salt Lake City Police Department and may be served at his place of employment at the Salt Lake Police Department located at 475 S 300 E, Salt Lake City, Utah 84111, or wherever he may be found. Defendant Beebe is being sued in his individual capacity.

3.      Defendant Rakim Redmon is an individual residing in Salt Lake County and at all times relevant to this lawsuit was a police officer with the Salt Lake City Police Department and may be served at his place of employment at the Salt Lake Police Department located at 475 S 300 E, Salt Lake City, Utah 8411, or wherever he may be found. Defendant Redmon is being sued in his individual capacity.

4.      Defendant Officer "U82" is an individual residing in Salt Lake County and at all times relevant to this lawsuit was a police officer with the Salt Lake City Police Department and may be served at his place of employment at the Salt Lake Police Department located at 475 S 300 E, Salt Lake City, Utah 8411, or wherever he may be found. It is believed that the last name of Defendant Officer "U82" is "Keep". However, in an abundance of caution, he will be referred to by his badge number as Defendant Officer "U82" throughout this Complaint. Defendant Officer "U82" is being sued in his individual capacity.

5.      Defendant Marika Ascarte is an individual residing in Salt Lake County and at all times relevant to this lawsuit was a police officer with the Salt Lake City Police Department and may be served at her place of employment at the Salt Lake Police Department located at 475 S 300 E, Salt Lake City, Utah 8411, or wherever she may be found. Defendant Ascarte is being sued in her individual capacity.

6.      Defendant Salt Lake City Corporation is a Utah municipal corporation located in Salt Lake City, Utah.

## II.
## JURISDICTION AND VENUE

7.      The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343 since Plaintiffs are suing for relief under 42 U.S.C. § 1983.

8.      Venue is proper in the District of Utah pursuant to 28 U.S.C. § 1391 because all or a substantial part of the causes of action accrued in the District of Utah.

## III.
## GENERAL ALLEGATIONS

9.      On August 14, 2022, Salt Lake Police Officers Dalton Beebe, Rakim Redmon, Officer "U82", and Marika Ascarte restrained Nykon Brandon by using each of their body weight to apply force to his back, neck, head, and legs as he laid face down on hot gravel with his hands handcuffed behind his back.

10.     Defendants Beebe, Redmon, Officer "U82", and Ascarte restrained Nykon in this manner for five minutes and one second (5:01), until Beebe asked, "Is he alive?"

11.     Nykon died from sudden cardiopulmonary arrest during a physical struggle with prone restraint. The doctor who performed his autopsy found that the struggle and restraint by other individuals contributed to his death.

12.     Nykon was the second person Salt Lake City Police Officers held down in this manner and killed in a matter of months. On January 30, 2022 – less than eight months prior – Salt Lake City Police Officers held down Megan Mohn in a prone position after handcuffing her, resulting in her death.

13.     It is clear that officers from the Salt Lake City Police Department are not being trained on the dangers associated with prone restraints, which can lead to positional asphyxia and death.

14.     In this case, Salt Lake City Police Officers were placed on notice that mental health issues were involved when a 911 call was made relaying that "a guy just tried to run in and steal beer" and that he was "definitely a danger to himself and maybe to traffic around here." The 911

caller stated, "definitely mental health issues going on, so if you've got mental health resources, send them out."

15.     Accordingly, the crime at issue here was attempted theft of a beer.

16.     It is readily apparent that the Salt Lake City Police Department is not being trained on the appropriate way to interact with someone experiencing a mental health crisis – as the 911 caller in this case requested mental health resources be sent but the first thing officers did in this case was use force.

17.     Further, in the killing of Megan Mohn months before Nykon was killed, Ms. Mohn was experiencing a mental health crisis and the Salt Lake City Police Officers clearly had not been trained on how to manage the situation. Instead, they held her down in the prone position causing her death, just as Defendants Ascarte, Officer "U82", Deebe, and Redmon did in this case with Nykon.

18.     The first two officers to arrive were Defendant Rakim Redmon and Defendant Dalton Beebe.

19.     Immediately upon encountering Nykon, they violently attacked him.

20.     Defendant Redmon initially appeared to be grabbing at Nykon but was cut off when Defendant Beebe forcefully shoved Nykon to the ground.

21.     Soon after, Defendant Officer "U82" and Defendant Officer Marika Ascarte arrive and also piled onto Nykon with Defendant Officer "U82" applying handcuffs.

22.     After Nykon was restrained in handcuffs behind his back, Defendant Ascarte used her body weight to continue applying pressure to Nykon's legs as he was held in the prone position on the hot gravel.

23.     After Nykon was restrained in handcuffs behind his back, Defendant Officer "U82" used his body weight to continue applying pressure to Nykon's back as he was held in the prone position on the hot gravel.

24.     After Nykon was restrained in handcuffs behind his back, Defendant Beebe used his body weight to continue applying pressure to Nykon's head, neck, and back – including forcing his knee into Nykon's back as he pushed Nykon's face into the hot gravel while Nykon was held in the prone position.

25.     After Nykon was restrained in handcuffs behind his back, Defendant Redmon used his body weight to continue applying pressure to Nykon's head, neck, and back – including forcing his knee into Nykon's back as he pushed Nykon's face into the hot gravel while Nykon was held in the prone position.

26.     Defendants Ascarte, Officer "U82", Beebe, and Redmon each used their body weight to continue applying pressure on top of Nykon for five minutes.

27.     Nykon continued to struggle and groan under the weight of Defendants Ascarte, Officer "U82", Beebe, and Redmon for five minutes before releasing what was likely his final breath.

28.     Moments before Nykon's death Defendant Redmon was "switched out" with another officer because he "slammed his knee into the gravel" and needed a break from applying pressure to Nykon's back, neck, and head.

29.     Imagine the pain and fear Nykon must have been experiencing as Defendants Ascarte, Officer "U82", Beebe, and Redmon used their body weight to force him down onto his stomach and face in the hot gravel.

30.     However, unlike Defendant Redmon, none of Defendants Ascarte, Officer "U82", Beebe, or Redmon allowed Nykon the opportunity to relieve himself from being crushed under their body weight as he was pressed against hot gravel.

31.     Body camera videos show that Defendants Redmon and Beebe first started using their body weight to force Nykon into the hot gravel at 15:22:27.

32.     Body camera videos show that Nykon was placed into handcuffs at 15:24:54.

33.     Body camera videos show that Defendants Ascarte, Officer "U82", Beebe, and Redmon each continued to use their body weight to apply pressure on top of Nykon's back, neck, head, and legs until he was rolled over at 15:27:28.

34.     This means that Defendants Ascarte, Officer "U82", Beebe, and Redmon continued to use their body weight to apply pressure on top of Nykon's back, neck, head, and legs for a total of five minutes and one second (5:01).

35.     The crime at issue was not a felony or violent crime, as the 911 caller stated that Nykon had only attempted to steal beer – but did not actually steal anything.

36.     Once Nykon was handcuffed with his hands behind his back, he was restrained and subdued and no longer presented a threat – especially with eleven officers present on scene.

37.     Once Nykon was handcuffed with his hands behind his back, he was not attempting to evade arrest, as he was surrounded by eleven officers, restrained in handcuffs, and made no attempts to leave.

38.     Once Nykon was handcuffed with his hands behind his back, he was not resisting – but simply attempting to breath as he was suffering under the force of Defendants Ascarte, Officer "U82", Beebe, and Redmon's body weight as his face was being pushed into the gravel.

39.     Once Nykon was handcuffed with his hands behind his back, he did not present a threat of serious bodily harm or death justifying the use of deadly force.

40.     Thus, it was unnecessary to continue applying pressure on top of Nykon AFTER he had his hands restrained behind his back in handcuffs, as he was subdued and did not present a threat to anyone.

41.     However, Defendants Ascarte, Officer "U82", Beebe, and Redmon continued to use their body weight to apply pressure on top of Nykon's back, neck, head, and legs for a total of **two minutes and thirty-four seconds (2:34) AFTER Nykon's hands were restrained in handcuffs behind his back**.

42.     The Tenth Circuit has found that "it was 'clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force.'" *Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008).

43.     In *Weigel*, the time period at issue of how long the defendants applied pressure on the suspect who was face-down in a prone position after being restrained was just under three minutes. *Id.* at 1152-53.

44.     In this case, Defendants Ascarte, Officer "U82", Beebe, and Redmon continued to use their body weight to apply pressure on top of Nykon's back, neck, head, and legs for a total of **two minutes and thirty-four seconds (2:34) AFTER Nykon's hands were restrained in handcuffs behind his back**.

45.     And while the first couple of minutes the Defendants were attempting to restrain Nykon in handcuffs, the entire time that Defendants Ascarte, Officer "U82", Beebe, and Redmon

continued to use their body weight to apply pressure on top of Nykon's back, neck, head, and legs was for a total of five minutes and one second (5:01).

46.     The time period prior to Nykon being handcuffed must also be looked at to understand why the subsequent two minutes and thirty-four seconds (2:34) of body weight restraint AFTER handcuffs were applied, were even more deadly than if the Defendants had only applied pressure for two minutes and thirty four seconds (2:34).

47.     Each of Defendants Ascarte, Officer "U82", Beebe, and Redmon understood that while they continued to use their body weight to apply pressure on top of Nykon's back, neck, head, and legs for a total of two minutes and thirty four seconds (2:34) AFTER Nykon's hands were restrained in handcuffs behind his back, they had already been using their body weight to apply pressure on top of Nykon's back, neck, head, and legs for two minutes and twenty seven seconds (2:27).

48.     Thus, the two minutes and thirty-four seconds of continued force AFTER Nykon was handcuffed was really compounding the previous two minutes and twenty-seven seconds (2:27) that had already occurred.

49.     Further, the ambient temperature when this occurred was between 84 degrees Fahrenheit and 86 degrees Fahrenheit.[1]

50.     When the ambient temperature is 85 degrees Fahrenheit outside, cement and blacktop in the sun will reach temperatures over 100 degrees Fahrenheit.[2]

---

[1] https://www.wunderground.com/history/daily/us/ut/salt-lake-city/KSLC/date/2022-8-14, last viewed on August 13, 2024.
[2] https://spectrumlocalnews.com/tx/south-texas-el-paso/weather/2020/08/19/too-hot-to-trot-with-mans-best-friend, last viewed on August 13, 2024.

51.     Accordingly, the hot gravel that Defendants Ascarte, Officer "U82", Beebe, and Redmon were forcing Nykon down on top of was likely over 100 degrees Fahrenheit, only adding to his distress and the unlawful use of excessive force.

52.     After Defendants Ascarte, Officer "U82", Beebe, and Redmon used their body weight to apply pressure to Nykon's back, neck, head, and legs for over five minutes (and over two and a half minutes AFTER Nykon was restrained in handcuffs behind his back), Defendant Beebe can be heard on body camera video asking, "is he alive?"

53.     Nykon died as a result of each of Defendants Ascarte, Officer "U82", Beebe, and Redmon using their body weight to apply pressure on top of Nykon's back, neck, head, and legs as he was in the prone position, face down on the ground, with his hands restrained behind his back in handcuffs.

54.     Following an autopsy, the medical examiner, Dr. Lily Marsden with the Utah Office of the Medical Examiner, determined that Nykon died as a result of a "sudden cardiopulmonary arrest during physical struggle with prone restraint in the setting of obesity and methamphetamine toxicity."

55.     Dr. Marsden explained that "the struggle and restraint by other individuals, combined with his obesity and methamphetamine toxicity, resulted in cardiopulmonary arrest."

56.     Defendants Ascarte, Officer "U82", Beebe, and Redmon were at all times acting under the color of law, as they were on duty, in full uniform, and responding to a call for service.

57.     These injuries were not caused by any means.

**IV.**
**CAUSES OF ACTION**

**FIRST CLAIM FOR RELIEF**

**Excessive Use of Deadly Force**
**Violation of the Fourth Amendment Pursuant to 42 U.S.C. Section 1983**
**Against Defendants Beebe, Redmon, Officer "U82", and Ascarte**

58.     Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

59.     Acting under the color of law, Defendants Beebe, Redmon, Officer "U82", and Ascarte each deprived Nykon of the rights and privileges secured to him by the Fourth Amendment, as applied to the states by the Fourteenth Amendment, to the United States Constitution and by other laws of the United States to be free from illegal and unreasonable seizures by the use of deadly force.

60.     Plaintiff brings this cause of action pursuant to 42 U.S.C. § 1983.

61.     The amount of force used by each of Defendants Beebe, Redmon, Officer "U82", and Ascarte against Nykon, as described above, specifically but not limited to, when each of Defendants Beebe, Redmon, Officer "U82", and Ascarte used their body weight to apply pressure on top of Nykon's back, neck, head, and legs as he was in the prone position, face down on the hot gravel, with his hands restrained behind his back in handcuffs, was only suspected of a nonviolent crime for attempting to steal beer, was not resisting as he was restrained and subdued in handcuffs, was not attempting to flee as he was restrained and subdued in handcuffs and surrounded by eleven officers, and was not posing a threat to anyone as he was restrained and subdued in handcuffs, but instead was simply experiencing a mental health crisis, was objectively unreasonable under the circumstances and inflicted unnecessary injury, pain, suffering, and death upon Nykon.

62.     A seizure is unreasonable if it results in (a) an injury, (b) that resulted directly and only from a use of force that was clearly excessive, and (c) the excessiveness was clearly unreasonable.

63.     At the time Defendants Beebe, Redmon, Officer "U82", and Ascarte each used their body weight to apply pressure to Nykon's back, neck, head, and legs while he was face down in the prone position experiencing a mental health crisis, it was clearly established that it was unreasonable for Defendants Beebe, Redmon, Officer "U82", and Ascarte to continue using their bodyweight force to hold Nykon in the prone restraint position after he was subdued and restrained.

64.     The Fifth Circuit listed cases from other Circuit Courts demonstrating the clearly established law under similar facts. *Timpa v. Dillard*, 20 F.4th 1020, 1036 (5th Cir. 2021); *See McCue v. City of Bangor*, 838 F.3d 55, 64 (1st Cir. 2016) (holding that "it was clearly established in September 2012 that exerting significant, continued force on a person's back 'while that [person] is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force' " (citation omitted)); ***Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008) (holding that "the law was clearly established," by December 2002, "that applying pressure to [a subject's] upper back, once he was handcuffed and his legs restrained, was constitutionally unreasonable due to the significant risk of positional asphyxiation associated with such actions")**; *Abdullahi v. City of Madison*, 423 F.3d 763, 764–66 (7th Cir. 2005) (holding that the record supported an inference of deadly force when an officer restrained a mentally ill individual in the prone restraint position with bodyweight force for thirty to forty-five seconds until the individual lost consciousness); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004) (holding that the law in April 2000 clearly established that "putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued

and/or incapacitated constituted excessive force"); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1061 (9th Cir. 2003) (holding that the continued use of a prone restraint with weight force "despite [the arrestee's] repeated cries for air, and despite the fact that his hands were cuffed behind his back and he was offering no resistance" constituted excessive force).

65.     The Tenth Circuit has found that "it was 'clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force.'" *Weigel*, 544 F.3d at 1155.

66.     In *Weigel*, the time period at issue of how long the defendants applied pressure on the suspect who was face-down in a prone position after being restrained was just under three minutes. *Id*. at 1152-53.

67.     In this case, Defendants Ascarte, Officer "U82", Beebe, and Redmon continued to use their body weight to apply pressure on top of Nykon's back, neck, head, and legs for a total of **two minutes and thirty-four seconds (2:34) AFTER Nykon's hands were restrained in handcuffs behind his back**.

68.     The crime at issue was not a felony or violent crime, as the 911 caller stated that Nykon had only attempted to steal beer – but did not actually steal anything.

69.     Once Nykon was handcuffed with his hands behind his back, he was restrained and subdued and no longer presented a threat – especially with eleven officers present on scene.

70.     Once Nykon was handcuffed with his hands behind his back, he was not attempting to evade arrest, as he was surrounded by eleven officers, restrained in handcuffs, and made no attempts to leave.

71.     Once Nykon was handcuffed with his hands behind his back, he was not resisting – but simply attempting to breath as he was suffering under the force of Defendants Ascarte, Officer "U82", Beebe, and Redmon's body weight as his face was being pushed into the gravel.

72.     Once Nykon was handcuffed with his hands behind his back, he did not present a threat of serious bodily harm or death justifying the use of deadly force.

73.     Once Nykon was handcuffed with his hands behind his back, the use of further force against him was unnecessary and unjustified. *Weigel*, 544 F.3d at 1155.

74.     Defendants Ascarte, Officer "U82", Beebe, and Redmon made no attempt to monitor Nykon's breathing, heart rate, or vitals.

75.     Defendants Ascarte, Officer "U82", Beebe, and Redmon knew that Nykon was experiencing a mental health crisis as Defendants Ascarte, Officer "U82", Beebe, and Redmon were responding to a call for service where the 911 caller stated, "definitely mental health issues going on, so if you've got mental health resources, send them out."

76.     However, Defendants Ascarte, Officer "U82", Beebe, and Redmon made no attempt to address Nykon's mental health issues – instead resorting immediately to force and continuing the use of force long after Nykon was restrained and subdued in handcuffs with his hands behind his back as he was held face down in the prone position.

77.     A reasonable officer would know that the use of deadly force is clearly excessive when engaging with suspects such as Nykon, who was not threatening any officer or other person and who the use of deadly force was not warranted, as he was restrained and subdued in handcuffs.

78.     A reasonable officer would know that the use of deadly force is clearly unreasonable when engaging with suspects such as Nykon, who was not threatening any officer or

15

other person and who the use of deadly force was not warranted, as he was restrained and subdued in handcuffs.

79.     A reasonable officer in each of Defendants Ascarte, Officer "U82", Beebe, and Redmon's shoes would know that using their body weight to apply pressure to Nykon's back, neck, head, and legs while he was face down in the prone position experiencing a mental health crisis and restrained and subdued in handcuffs with his hands behind his back is clearly unreasonable and excessive.

80.     As a direct result of the deadly force used against him by each of Defendants Ascarte, Officer "U82", Beebe, and Redmon, Nykon suffered physical injury, pain, mental anguish, and death for which Plaintiff sues herein.

81.     As a result of each of Defendants Ascarte, Officer "U82", Beebe, and Redmon's unjustified, excessive, illegal, and deadly use of force, Nykon experienced conscious pain and suffering – as he can be seen and heard in the body camera videos suffering and trying to breathe.

82.     As a result of each of Defendants Ascarte, Officer "U82", Beebe, and Redmon's unjustified, excessive, illegal, and deadly use of force, Nykon died.

83.     These injuries were not caused by any other means.

### SECOND CLAIM FOR RELIEF

*Monell v. New York City Department of Social Services*
**Violation of the 4th Amendment Pursuant to 42 USC § 1983**
**Against Defendant Salt Lake City Corporation**

84.     Municipalities and other local governments are "persons" within the meaning of Section 1983 and can therefore be held liable for violating a person's constitutional rights. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978).

85.     To hold a municipality liable under § 1983, a plaintiff must prove (1) the existence of a municipal policy or custom by which the plaintiff was denied a constitutional right and (2) the policy or custom was the moving force behind the constitutional deprivation. *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

86.     The existence of that direct causal link does not turn on the enactment or adoption of an official policy. Rather, a municipality may be liable for constitutional violations resulting from its customs, even if those customs have not received formal approval from the municipality's policymakers. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

87.     The Tenth Circuit has found that a policy or custom may take one of five forms: (1) a formal regulation or policy statement; (2) that an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused. *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010).

88.     This requirement is satisfied if the plaintiff shows that "the municipality was the 'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404, 117 S.Ct. 1382.

89.     The Supreme Court has held that a municipal policy may include not only policy statements, ordinances, and regulations but the individual decisions of city officials who have "final policymaking authority." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292,

1300, 89 L.Ed.2d 452 (1986) (plurality opinion); *see also Randle v. City of Aurora*, 69 F.3d 441, 447–49 (10th Cir.1995).

90.     Proof of a single incident of unconstitutional activity is ordinarily not sufficient to impose municipal liability, and where a plaintiff seeks to impose municipal liability on the basis of a single incident, the plaintiff must show the particular illegal course of action was taken pursuant to a decision made by a person with authority to make policy decisions on behalf of the entity being sued. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–85, 106 S.Ct. 1292, 1300–01, 89 L.Ed.2d 452 (1986); *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir.1996).

91.     Under *Monell*, a municipality may be held liable if a final municipal policymaker ratifies the unlawful conduct or decision of a subordinate and the basis for the conduct or decision. *Brammer–Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1186 (10th Cir.2010); *Bryson*, 627 F.3d at 790.

92.     "[T]he final policymaker must not only approve the decision, but also adopt the basis for the decision, and the ratification must be the moving force, or cause, of the alleged constitutional violation. *Dempsey v. City of Baldwin*, 143 F. App'x 976, 986 (10th Cir.2005); see also *Praprotnik*, 485 U.S. at 127, 108 S.Ct. 915.

## POLICYMAKER

93.     The identification of policymaking officials is a question of state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

94.     According to the Tenth Circuit, "in deciding whether an official is a final policymaker, "we are interested only in delegations of legal power." *Milligan–Hitt v. Bd. of Trs. of Sheridan County Sch. Dist*. No. 2, 523 F.3d 1219, 1227 (10th Cir.2008); *see also Wulf v. City*

*of Wichita*, 883 F.2d 842, 869 (10th Cir.1989) ("*Praprotnik* directs us to look only at where statutory policymaking authority lies, rather than where de facto authority may reside.").

95.     Three factors are relevant in deciding whether an individual is legally a final policymaker for a municipality: "(1) whether the official is meaningfully constrained by policies not of that official's own making; (2) whether the official's decision[s] are final—i.e., are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir.1995).

## UNCONSTITUTIONAL POLICIES AND TRAINING

96.     Here, Defendant Salt Lake City Corporation through its final decision-makers – Chief Brown and Mayor Mendenhall on behalf of the City Council – approved, ratified, and condoned the unconstitutional actions of the officers who killed Megan Mohn by using their body weight to restrain her face down in a prone position during a mental health crisis resulting in her death. *See Bryson v. City of Okla. City*, 627 F.3d 784, 790 (10th Cir.2010). A municipality will not be found liable under a ratification theory unless a final decisionmaker ratifies an employee's specific unconstitutional actions, as well as the basis for these actions.

97.     Specifically, the officers responsible for the death of Megan Mohn were not disciplined but instead were found justified and it was determined they acted within policy.

98.     This is evidence that it was the policy of the SLCPD for officers to use their body weight to apply pressure on the back of a restrained and subdued detainee who has been handcuffed and is face down in a prone position, not presenting a threat.

99. Salt Lake City Corporation's ratification of the officers' conduct in the killing of Megan Mohn caused Defendants Ascarte, Officer "U82", Beebe, and Redmon to use the same type of unjustified deadly force against Nykon.

100. Salt Lake City Corporation's ratification of the officers' conduct in the killing of Megan Mohn creates *Monell* liability, as this ratification demonstrated accepted behavior of officers in the Salt Lake City Police Department, which caused Defendants Ascarte, Officer "U82", Beebe, and Redmon to use the same type of unjustified deadly force against Nykon. *Brammer–Hoelter*, 602 F.3d at 1186; *Bryson*, 627 F.3d at 790; *Dempsey*, 143 F. App'x at 986; see also *Praprotnik*, 485 U.S. at 127, 108 S.Ct. 915.

101. Further, based on the officers' actions in Megan Mohn's death and Defendants Ascarte, Officer "U82", Beebe, and Redmon's actions causing Nykon's death in this case, it is clear that Salt Lake City Corporation is not training Salt Lake City Police Officers on the dangers associated with prone restraints, which can lead to positional asphyxia and death – as the offices who killed Megan Mohn were found to be acting in accordance with Salt Lake City Police Department training.

102. Upon information and belief, after a reasonable opportunity for further investigation or discovery into information solely within the possession of Defendant Salt Lake City Corporation, evidence will reveal this lack of training on the dangers associated with prone restraints, which can lead to positional asphyxia and death. Fed. R. Civ. P. 11(b)(3).

103. Additionally, based on the officers' actions in Megan Mohn's death – where she was experiencing a clear mental health crisis – and Defendants Ascarte, Officer "U82", Beebe, and Redmon's actions causing Nykon's death in this case, it is clear that Salt Lake City Corporation is not training Salt Lake City Police Officers on the appropriate way to interact with

someone experiencing a mental health crisis – as the 911 caller in this case requested mental health resources be sent but the first thing officers did in this case was use force.

104.   Upon information and belief, after a reasonable opportunity for further investigation or discovery into information solely within the possession of Defendant Salt Lake City Corporation, evidence will reveal this lack of training on the appropriate way to interact with someone experiencing a mental health crisis. Fed. R. Civ. P. 11(b)(3).

105.   This department policy and training is a violation of the constitution as it causes officers, such as Defendants Ascarte, Officer "U82", Beebe, and Redmon in this case, not to adequately respond to a mental health crisis but instead to use excessive force by way of applying pressure with their body weight to a subdued detainee at risk of positional asphyxia, in violation of the Fourth Amendment to the United States Constitution as is shown in the clearly established case law of the Tenth Circuit and the Supreme Court of the United States.

106.   Thus, Defendant Salt Lake City Corporation is liable for its unconstitutional policies and training which caused each of Defendants Ascarte, Officer "U82", Beebe, and Redmon to violate Nykon's constitutional rights, resulting in his death.

## V.
## PUNITIVE DAMAGES

107.   Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

108.   When viewed objectively from the standpoint of Defendants Ascarte, Officer "U82", Beebe, and Redmon, at the time of the occurrence, Defendants Ascarte, Officer "U82", Beebe, and Redmon's conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

109.    As a direct, proximate, and producing cause and the intentional, egregious, malicious conduct by Defendants Ascarte, Officer "U82", Beebe, and Redmon, which was recklessly or callously indifferent to Nykon's federally protected rights, Plaintiff is entitled to recover punitive damages against each of Defendants Ascarte, Officer "U82", Beebe, and Redmon in an amount within the jurisdictional limits of this Court.

## VI.
## DAMAGES

110.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

111.    Plaintiff's injuries were a foreseeable event.

112.    Those injuries were directly and proximately caused by Defendants Ascarte, Officer "U82", Beebe, and Redmon's excessive use of deadly force against Nykon and Salt Lake City Corporation's unconstitutional policies, practices, and failure to train applied against Nykon.

113.    As a result, Plaintiff is entitled to recover all actual damages allowed by law.

114.    Plaintiff contends that Defendants Ascarte, Officer "U82", Beebe, and Redmon's conduct constitutes of malice, evil intent, or reckless or callous indifference to Plaintiff's constitutionally protected rights. Thus, Plaintiff is entitled to punitive damages against Defendants Ascarte, Officer "U82", Beebe, and Redmon.

115.    Plaintiff seeks a money judgment consisting of compensatory, special, and punitive damages, along with attorneys' fees and costs under 42 U.S.C. § 1988 and prejudgment interest.

116.    As a direct and proximate result of the occurrence which made the basis of this lawsuit, Plaintiff has been forced to suffer:

  a.  Actual damages;
  b.  Loss of affection, consortium, comfort, financial assistance, protection, and care;
  c.  Pain and suffering and mental anguish suffered by Nykon prior to his death;

    d.   Mental anguish and emotional distress suffered by Nykon's heirs;

    e.   Loss of quality of life;

    f.   Funeral and burial expenses;

    g.   Loss of service;

    h.   Loss of earnings and contributions to Nykon's heirs; and

    i.   Prejudgment interest and Post judgment interest.

117.    Pursuant to 42 U.S.C. § 1983 and § 1988, Plaintiff seeks to recover, and hereby requests the award of punitive damages, reasonable attorney's fees, and costs of court.

## VII.
## ATTORNEY'S FEES

118.    If Plaintiff prevails in this action, by settlement or otherwise, Plaintiff is entitled to and hereby demand attorney's fees under 42 U.S.C. § 1988.

## VIII.
## JURY REQUEST

119.    Plaintiff respectfully requests a jury trial.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that judgment be rendered against Defendants, for an amount in excess of the jurisdictional minimum of this Court. Plaintiff further prays for all other relief, both legal and equitable, to which she may show herself justly entitled.

**DATE**: August 13, 2024.

Respectfully submitted,

*/s/ James P. Roberts*
James P. Roberts, #19180
PALMER PERLSTEIN
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
(214) 987-4100
james@palmerperlstein.com

**COUNSEL FOR PLAINTFF**